# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

ROBERT BELMAR,        )
        )
   Plaintiff,      )
        )
  vs.        )       **Case No. 4:04CV1445CAS (LMB)**
        )
JO ANNE B. BARNHART,     )
Commissioner of Social Security,   )
        )
   Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Robert Belmar for a Period of Disability and Disability Insurance Benefits[1] under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 15).

## Procedural History

Plaintiff filed his initial application for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income on June 22, 1998, claiming that he became unable to work due

---

[1] Plaintiff's date last insured was December 31, 2005. (Tr. 312). As such, to be eligible for benefits under Title II, plaintiff must demonstrate disability on or before this date.

to his disabling condition on January 31, 1997. (Tr. 94-97). This claim was denied initially and

on reconsideration. (Tr. 80-83, 86-90). Following an administrative hearing, plaintiff's claim was

denied in a written opinion by an Administrative Law Judge (ALJ), dated July 8, 1999.

(Tr. 14-30). Plaintiff then filed a request for review of the ALJ's decision with the Appeals

Council of the Social Security Administration (SSA), which was denied on January 23, 2002.

(Tr. 12-13, 6-7). Plaintiff then filed a Complaint in the United States District Court, which

resulted in a judgment remanding the case to the Commissioner for further proceedings.

(Tr. 338). The Appeals Council remanded the matter for an additional hearing on December 27,

2002. (Tr. 339-40). After holding an additional hearing on September 23, 2003, the ALJ again

denied plaintiff's claim for benefits in a written opinion dated June 21, 2004. (Tr. 607-63, 308-

26). Thus, this decision of the ALJ stands as the final decision of the Commissioner. See 20

C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on September 23, 2003. (Tr. 609). Plaintiff

was present and was represented by counsel. (Id.). The ALJ noted that a vocational expert,

Brenda Young, was present. (Id.). The ALJ admitted a number of exhibits into the record.

(Tr. 610).

The ALJ then examined plaintiff, who testified that he was 42 years of age and that he was

left-handed. (Tr. 611). Plaintiff stated that he lived with his two children, who were nine and

seven, and that his sixteen-year-old son occasionally stayed with him. (Id.). Plaintiff testified that

he lived in Des Arc, which was approximately 120 miles from St. Louis. (Tr. 612). Plaintiff

stated that his father drove him to the hearing. (Id.). Plaintiff testified that he only drives short distances, such as the 20 to 30 minutes drive to Piedmont, Missouri. (Id.). Plaintiff stated that his chiropractor's office is located in Piedmont. (Id.). Plaintiff testified that he also shops for groceries in Piedmont, as there is no grocery store in Des Arc. (Id.).

Plaintiff testified that he graduated from high school and he attended technical school in Poplar Bluff, Missouri. (Tr. 613). Plaintiff stated that he studied machine tool technology in technical school. (Id.). Plaintiff testified that he also took computer-aided drafting classes at Poplar Bluff Community College in 2000, although he did not graduate. (Tr. 614). Plaintiff stated that he did not complete the program because he was unable to pass the math classes. (Id.).

Plaintiff testified that he did not work for a while after leaving Poplar Bluff Community College because he could not find a job that he was able to perform. (Tr. 615). Plaintiff stated that he was looking for a position that did not require constant standing or heavy lifting. (Id.). Plaintiff testified that he worked briefly at a paper company driving a forklift. (Id.). Plaintiff stated that he was fired from this position because he was "unsafe." (Id.). Plaintiff explained that he had difficulty dropping objects from the fork. (Tr. 616). Plaintiff testified that he thinks the name of this company was Ozark Paper. (Tr. 616-17).

Plaintiff testified that he also worked at United Engineering, an aircraft parts manufacturing plant, drilling holes in pieces of metal. (Tr. 617-18). Plaintiff stated that he was laid off from this position. (Tr. 618). Plaintiff testified that he next worked at Libela Industries at a position that involved placing wire into a machine. (Tr. 617-18). Plaintiff stated that he worked at this position for three to four months. (Tr. 618). Plaintiff testified that he then started working

- 3 -

at an onion ring factory, Specialty Brands, where he picked up onion rings from the line and moved boxes on a conveyer belt. (Tr. 619). Plaintiff stated that the heaviest thing he lifted at this position weighed about fifteen pounds. (Id.). Plaintiff testified that he worked at this position for six to eight months, until February or March of 2003. (Id.). Plaintiff stated that he was injured in an automobile accident in December of 2002, after which he was unable to perform the position. (Tr. 619-20).

Plaintiff testified that he has been treated by Dr. Michael Toney, Dr. Kee Park, Dr. Richard Moore, and a chiropractor since the automobile accident. (Tr. 620). Plaintiff stated that he has received two epidural steroid injections from Dr. Toney. (Tr. 621). Plaintiff testified that the epidural steroid injections did not provide any relief. (Id.). Plaintiff stated that Dr. Toney referred him to a chiropractor after several months of treatment because plaintiff did not want to undergo surgery. (Id.). Plaintiff testified that he was seeing a chiropractor two to three times a week at the time of the hearing. (Id.). Plaintiff stated that his chiropractor referred him to a pain clinic and that the pain clinic in turn referred him to Dr. Park. (Id.).

Plaintiff testified that Dr. Park prescribes medication for him. (Tr. 622). Plaintiff stated that he takes Percodan[2] and Valium.[3] (Id.). Plaintiff testified that Dr. Park did not recommend surgery because he believed it would not be beneficial. (Id.). Plaintiff stated that he saw Dr. Park four to five times, the last time being in July of 2003. (Id.). The ALJ indicated that he only had one treatment note from Dr. Park. (Id.). Plaintiff testified that he stopped seeing Dr. Park

---

[2]Percodan is indicated for the management of moderate to moderately severe pain. See Physicians' Desk Reference (PDR), 1132 (61st Ed. 2007).

[3]Valium is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety. See PDR at 2819.

because he lost his private insurance coverage when he was fired. (Tr. 623). Plaintiff stated that he started seeing Dr. Toney at that time. (Id.). Plaintiff testified that he last saw Dr. Toney a month and a half prior to the hearing. (Tr. 625).

Plaintiff testified that he also saw Dr. Paul Raines on one occasion. (Tr. 623-24). Plaintiff stated that Dr. Raines ordered a CAT scan of his back. (Tr. 624). Plaintiff testified that he was scheduled to undergo a CAT scan later in the week of the hearing. (Id.). Plaintiff stated that he was referred to Dr. Raines by his friend Diane. (Id.). Plaintiff explained that he told Diane about his medical problems when she was visiting him at his home. (Id.).

Plaintiff testified that he obtains his prescription medication at the Wal-Mart pharmacy in Piedmont and Cape Girardeau. (Tr. 625). Plaintiff stated that Dr. Park's office is located in Cape Girardeau. (Id.). Plaintiff testified that he takes both Percodan and Valium twice daily. (Id.). Plaintiff stated that he takes the first dosage an hour after waking up in the morning and he takes the second dosage late in the afternoon. (Id.). Plaintiff testified that he usually wakes up at around 5:00 a.m., and he goes to bed at around 8:00 p.m. (Tr. 626). Plaintiff stated that he takes naps throughout the day. (Id.). Plaintiff testified that his medications cause him to become drowsy. (Id.).

Plaintiff testified that he usually lies on the couch after he wakes up in the morning. (Id.). Plaintiff stated that he spends the majority of his day lying on the couch. (Id.). Plaintiff testified that he gets up before his children come home from school, which is about 4:00 p.m. (Tr. 626-27). Plaintiff stated that he has been divorced since 1988. (Tr. 627). Plaintiff testified that he became involved with the mother of his two young children after his divorce, but that relationship has ended. (Id.). Plaintiff stated that a woman from the Independent Living Center comes to his

home five days a week and washes dishes, cooks dinner, and does the laundry.

(Tr. 627-28). Plaintiff testified that he has been receiving this assistance since July of 2003 and that prior to this time he, his father, and his sister performed the household chores. (Tr. 628).

Plaintiff testified that he spends most of his day in the house, although he occasionally drives to his parents' house. (Id.). Plaintiff stated that his parents live a quarter of a mile away from him. (Id.). Plaintiff testified that his sister, who lives in Piedmont, used to perform his household chores. (Id.). Plaintiff stated that he does not have any friends. (Tr. 629). Plaintiff testified that he has known Diane, the woman who referred him to Dr. Raines, for about six months. (Id.). Plaintiff stated that he met Diane through another friend, Rhea Frohman. (Id.). Plaintiff testified that he drives three to four miles to Rhea's house to visit. (Id.). Plaintiff stated that he visits with Rhea three to four times a month. (Id.).

Plaintiff testified that his father and his sixteen-year-old son perform the yard work. (Tr. 630). Plaintiff stated that he can lift between ten and twenty pounds. (Id.). Plaintiff testified that he could sit comfortably for 20 to 30 minutes. (Id.). Plaintiff stated that he could stand or walk for about 30 minutes. (Id.). Plaintiff testified that he spends most of the time lying down watching television, trying to find a comfortable position. (Tr. 631). Plaintiff stated that he does not have any other interests. (Id.). Plaintiff testified that he is involved in litigation regarding the automobile accident. (Id.). Plaintiff stated that he is represented by an attorney with regard to this suit. (Id.).

Plaintiff testified that he has been using a cane for about a month and a half because he was losing his balance and experiencing hip pain. (Id.). Plaintiff stated that Dr. Raines prescribed the cane the first time he saw him. (Tr. 632). Plaintiff testified that he has not seen Dr. Raines

since his initial visit. (Id.). Plaintiff stated that Dr. Raines is not a specialist. (Id.). Plaintiff stated that the only other type of wrap, support, or assistive device, that he uses is an Ace bandage on his knee, which was not prescribed by a doctor. (Id.).

Plaintiff testified that he has not taken any trips in the past few years other than for medical treatment. (Id.). Plaintiff stated that he experiences difficulty tying his shoes and trimming his toenails because he cannot bend over due to pain and stiffness in his back, left knee, and neck. (Tr. 633-34). Plaintiff testified that he underwent two surgeries on his left knee more than ten years prior to the hearing. (Tr. 634). Plaintiff stated that he has not received any treatment since then because he feels there is nothing his doctors could do for him. (Id.).

Plaintiff testified that he experiences some difficulty bending his knee, although he has the most difficulty with his back. (Tr. 635). Plaintiff stated that he has been experiencing severe back pain for six years or more. (Id.). Plaintiff testified that his back pain will subside for a period of time until he moves in a certain way and it goes out again. (Id.). Plaintiff stated that his back last went out about two months prior to the hearing, when he attempted to lift a cooler while on a fishing trip with his children. (Tr. 636). Plaintiff testified that he saw Dr. Raines shortly after this incident. (Id.). Plaintiff stated that he has never declined treatment recommended by his doctors due to an inability to pay. (Tr. 637). Plaintiff testified that he has not undergone physical therapy, other than receiving electrical treatment to his back from a chiropractor. (Id.).

Plaintiff's attorney pointed out to the ALJ that the record did contain treatment notes from Dr. Park. (Tr. 637-38). Plaintiff's attorney then examined plaintiff, who testified that his condition changed after his automobile accident, which occurred in December of 2002. (Tr. 638). Plaintiff stated that he experiences more pain in the back of his legs and he frequently

drops objects out of his left hand. (Tr. 639). Plaintiff explained that he loses feeling in his hand, which causes him to drop objects such as coffee cups and car keys. (Id.). Plaintiff testified that these symptoms have intensified since the accident. (Id.). Plaintiff stated that he experiences numbness and pain in his hand twice as often as he did prior to the accident. (Tr. 640). Plaintiff testified that he also has difficulty looking down and turning his head from side to side. (Id.). Plaintiff stated that it is difficult for him to drive due to these impairments. (Id.).

Plaintiff testified that he experiences difficulty bending due to shooting pains in his back and legs. (Tr. 641). Plaintiff stated that he uses a "Grip-It," which is a device that assists him in picking up objects from the floor. (Id.). Plaintiff testified that a friend of his gave him the Grip-It. (Tr. 642).

Plaintiff testified that he has experienced difficulty with concentration and memory since prior to the accident. (Id.). Plaintiff stated that this impairment contributed to his difficulties in math classes at Three Rivers Community College. (Id.).

Plaintiff testified that he believes he is depressed because he has crying spells several times a week. (Tr. 642). Plaintiff stated that he calls his minister when he feels depressed and his minister helps him by coming to his house or speaking with him over the phone. (Id.). Plaintiff testified that his depression has remained the same since before the accident. (Id.).

Plaintiff testified that his relationship with the mother of his children is "very bad." (Id.). Plaintiff stated that they argue every time they see each other. (Tr. 644). Plaintiff testified that his relationship with the mother of his children has contributed to his depression. (Id.). Plaintiff stated that he does not have any suicidal or homicidal thoughts. (Id.).

Plaintiff testified that he does not sleep well. (Id.). Plaintiff stated that he is restless and

that he wakes up at least twice during the night for periods of at least twenty minutes. (Id.). Plaintiff testified that about once or twice a month he stays up all night because he is unable to sleep. (Id.). Plaintiff stated that his sleep has worsened since the accident. (Tr. 645).

The ALJ then examined plaintiff, who testified that he goes to church, which is a few miles from his home. (Id.). Plaintiff stated that he attends church services weekly and that the services usually last about an hour and a half. (Tr. 645-46).

Plaintiff testified that his children stay with him during the week and that his mother helps him with the children. (Tr. 646). Plaintiff stated that he filed a petition for custody of his children after their mother ran away with them. (Tr. 647).

Plaintiff testified that his friend Ricky bought him the device that helps him pick up objects. (Tr. 648). Plaintiff stated that Ricky gave him this item because he observed plaintiff experiencing difficulty picking up things. (Id.). Plaintiff testified that he visits with Ricky at his own house or at Ricky's house once or twice a week. (Tr. 649).

The vocational expert, Brenda Young, then indicated that she had questions regarding plaintiff's past work. (Tr. 651). Plaintiff testified that he used a crane to lift objects at his position at the aluminum manufacturing plaint. (Tr. 651). Plaintiff stated that he did a minimal amount of lifting at this position, whatever a standard drill bit would weigh. (Tr. 652). Plaintiff testified that he worked for Vess Whistle Soda Company as a machine operator in 1992. (Id.). Plaintiff stated that the heaviest amount he lifted at that position was the weight of a case of soda. (Id.). Plaintiff testified that he worked as an electric rewinder, which involved operating a small chain hoist crane and placing parts on a table. (Tr. 653). Plaintiff stated that he then pushed a button on a machine, which would complete the process. (Id.). Plaintiff testified that he received

on-the-job training for this position. (Id.).

The ALJ then examined Ms. Young, who testified that plaintiff's past work as a machine operator would be classified as light and unskilled, his position as machine operator and packager at Vess was unskilled and light to medium, his position at Specialty Brand Foods cleaning and packaging was light and unskilled, and his position as an electric rewinder was light and unskilled. (Tr. 654). The ALJ asked Ms. Young to assume a hypothetical individual of plaintiff's age, education, and work experience with the following limitations: occasionally stooping and crouching; maximum lifting of twenty pounds occasionally and ten pounds frequently; could sit at least six hours in an eight-hour workday with normal breaks; could stand or walk at least six hours in an eight-hour workday with normal breaks; must avoid climbing ladders, scaffolds, and ropes; limited to noncomplex, simple or repetitive type work. (Id.). Ms. Young testified that the hypothetical individual would be capable of performing plaintiff's past work as a food laborer and as a machine operator. (Id.).

The ALJ next asked Ms. Young to assume a hypothetical individual who would be limited to lifting only ten pounds, with the same other restrictions as the earlier hypothetical. (Tr. 655). Ms. Young testified that the individual could perform the food laborer position, along with other work in the economy, such as counter attendant, electrical assembly, dining room helper, and security guard. (Id.). Ms. Young stated that the other positions in the economy she described are classified as light work. (Id.).

The ALJ then asked Ms. Young to assume the individual was required to use a cane for ambulation. (Id.). Ms. Young testified that this restriction would probably eliminate the security guard position, dining room position, and the counter positions, but not the electronic assembly

positions.  (Id.).

The ALJ next asked Ms. Young to assume the individual could lift a maximum of ten pounds, with the same non-exertional limitations, except that the person would be required to alternate sitting and standing throughout a normal eight-hour workday.  (Tr. 656).  Ms. Young testified that these restrictions would eliminate the light work positions and reduce the possible jobs to only sedentary positions.  (Id.).  Ms. Young stated that there are 2,000 sedentary assembly positions in the St. Louis metro area.  (Id.).  Ms. Young testified that there are 1,000 sedentary positions that do not require any specific clerical duties.  (Id.).  Ms. Young stated that the individual could perform sedentary positions even if he were required to use a cane.  (Tr. 657).

The ALJ then asked Ms. Young to assume that the individual was required to miss work for more than two days a month.  (Tr. 656).  Ms. Young testified that this would exceed the expectations of most employers.  (Tr. 657).

The ALJ asked Ms. Young to assume that the individual could only occasionally lift above the shoulder level.  (Id.).  Ms. Young testified that this restriction would not preclude any of the positions she mentioned in any of the hypotheticals.  (Id.).

Plaintiff's attorney then asked Ms. Young to assume that the individual has difficulty holding small objects in his left dominant hand.  (Id.).  Ms. Young testified that this limitation would eliminate the sedentary assembly jobs and all of the light work except the security guard position.  (Tr. 658).  Ms. Young stated that a limitation in the individual's ability to reach in all directions with the dominant hand would have the same effect on the jobs the individual would be able to perform.  (Id.).

Ms. Young testified that deficiencies of concentration and persistence of pace would not

have an effect on the individual's ability to perform the jobs she described because the positions are simple and repetitive and do not require more than ordinary attention or concentration. (Id.). Ms. Young stated that the individual would not be able to perform the positions if the deficiencies in concentration prevented him from performing the essential duties. (Id.). Ms. Young testified that if the individual was unable to perform his job duties due to lack of concentration twenty percent of the time this would not be acceptable to most employers.

(Tr. 659). Ms. Young stated that if the individual was moderately limited in his ability to maintain attention, this would have no effect on his ability to perform the jobs she mentioned. (Id.).

Plaintiff's attorney asked Ms. Young whether an individual whose ability to cope with stresses and pressures of routine activities was "questionable" could perform the jobs she mentioned. (Tr. 660). Ms. Young testified that she did not have enough information to determine whether this restriction would affect her answers. (Id.).

The ALJ requested plaintiff's updated medical records from Dr. Raines, Dr. Toney, and Dr. Richard Gayle, along with plaintiff's prescription records from Wal-Mart. (Tr. 660-61). The ALJ indicated that he would review these records and order a consultative examination if necessary and then make a decision. (Tr. 662).

## B.    **Relevant Medical Records**

The record reveals that plaintiff presented to James MacMillan, D.O. on March 13, 1995, complaining of lower back pain. (Tr. 172). Plaintiff reported that he had twisted his back, which resulted in lower back pain, especially on the left, with radiation into his left leg. (Id.). Dr. MacMillan indicated that plaintiff had a history of back problems including back surgery. (Id.).

Upon physical examination, Dr. MacMillan found mild tenderness in the bilateral thoracic[4] region with significant muscular spasm in the lumbar region.  (Id.).  Dr. MacMillan's impression was lumbar strain with radicular pain.  (Id.).  He prescribed Toradol[5] and Flexeril.[6]  (Id.).  Plaintiff complained of persistent back pain with no radicular pain on March 15, 1995.  (Tr. 173).  Dr. MacMillan's impression was lumbar strain.  (Id.).  He prescribed Lodine.[7]  (Id.).  On March 18, 1995, plaintiff reported that his pain had improved but had not completely resolved.  (Id.).  Dr. MacMillan indicated that he would refer plaintiff to an orthopedist if his pain did not improve.  (Id.).

The record indicates that plaintiff requested medication refills on May 8, 1995, but Dr. MacMillan would not refill the medication, instead instructing plaintiff that the medication must last two months.  (Tr. 174).

On June 6, 1995, plaintiff complained of right shoulder pain.  (Id.).  Dr. MacMillan noted that plaintiff had trouble previously with his shoulder as a result of using a wrench to tighten a screw.  (Id.).  Upon physical examination, Dr. MacMillan found swelling and tenderness of the

---

[4]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[5]Toradol is a nonsteroidal anti-inflammatory drug indicated for the short-term management of acute pain.  See PDR at 565.

[6]Flexeril is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  See Physicians' Desk Reference, 1797 (54th Ed. 2000) ("PDR 54th Ed.").

[7]Lodine is indicated for acute and long-term use in the management of arthritis and for the management of pain.  See PDR 54th Ed. at 3263.

right shoulder and limited range of motion. (Id.). Dr. MacMillan prescribed Toradol and a sling for plaintiff's right shoulder. (Id.). Plaintiff presented for a recheck of his right shoulder on June 8, 1995. (Tr. 175). Plaintiff continued to complain of pain with no improvement with anti-inflammatories. (Id.). Dr. MacMillan's impression was persistent bursitis.[8] (Id.). He continued plaintiff on his medication regimen and returned plaintiff to work on limited duty with no use of his right shoulder. (Id.).

In a note dated June 15, 1995, Dr. MacMillan stated that plaintiff requested "additional mood altering substances today in the form of Placidyl."[9] (Tr. 176). Dr. MacMillan indicated that he had informed plaintiff that he would be unable to prescribe the medication, as his medication was to last two months. (Id.). Dr. MacMillan further noted that plaintiff continued to "pester [him] and [his] office staff about giving him a note stating that he cannot work at all," despite Dr. MacMillan's finding that plaintiff may work with the exception of using his right arm. (Id.).

Plaintiff presented to neurosurgeon K. Charles Cheung on March 1, 1996, with complaints of left leg pain and left arm pain since an injury he sustained on January 31, 1996. (Tr. 192-94). Plaintiff indicated that he started experiencing back and neck pain after he picked up a tire rim with a steel plate and tossed it on a table. (Tr. 192). Plaintiff also complained of neck pain, headaches, and a sensation of falling asleep and paresthesia in the foot area and in the left arm. (Id.). Dr. Cheung noted that plaintiff had seen Dr. Munch who prescribed him Prednisone,[10] with

---

[8]Inflammation and pain around joints, tendons, and ligaments. See Stedman's Medical Dictionary, 262 (27th Ed. 2000).

[9]Placidyl is indicated as short-term hypnotic therapy for periods up to one week in duration for the management of insomnia. See PDR 54th Ed. at 472.

[10]Prednisone is indicated for the treatment of arthritis. See PDR at 568.

no improvement, and that plaintiff had seen a chiropractor but did not notice any improvement.

(Id.). Dr. Cheung's impression was C8 nerve root impingement, discogenic pain and L4-5[11] and

S1[12] nerve root impingement. (Tr. 193). Dr. Cheung recommended that plaintiff undergo an

MRI for his neck and his back. (Id.). He refilled plaintiff's prescription for Lortab.[13] (Id.).

Plaintiff underwent an MRI of the lumbar and cervical spine on March 4, 1996.

(Tr. 203). The impression of the physician reviewing the lumbar spine MRI was status post-

laminotomy at L5-S1, evidence of degenerative disk disease, and no nerve root impingement.

(Id.). Plaintiff's cervical spine MRI was normal. (Tr. 204).

Plaintiff presented to Dr. Cheung for a follow-up on March 18, 1996. (Tr. 195). Plaintiff

reported that his leg pain was much improved and that he had no arm pain. (Id.). Dr. Cheung

recommended a work conditioning/work hardening program, with a goal of eighty pounds of free

weight. (Id.). Plaintiff presented for a followup on April 15, 1996, at which time plaintiff

complained of pain in the left buttock area and the anterior lateral aspect of his foot. (Tr. 196).

Dr. Cheung noted that plaintiff had attended five sessions of a work conditioning program. (Id.).

Dr. Cheung indicated that according to a report, plaintiff had problems with mood disturbance

and perceived pain level and he had not made much progress. (Id.). Dr. Cheung prescribed a

TENS unit.[14] (Id.).

---

[11]Abbreviation for lumbar vertebrae (L1 to L5). Stedman's at 956.

[12]Abbreviation for sacral vertebra (S1-S5). Stedman's at 1586.

[13]Lortab is indicated for the relief of moderate to moderately severe pain. See PDR 54th Ed. at 3121.

[14]Acronym for "Transcutaneous Electrical Nerve Stimulator," a method of pain relief achieved by the application of minute electrical impulses to nerve endings. See The American Medical Association Encyclopedia of Medicine, 1003 (1989).

Plaintiff presented to Dr. MacMillan on June 17, 1996, complaining of left low back pain radiating to the left leg due to lifting a tire at home the previous week. (Tr. 177). Plaintiff also complained of burning in his left forearm. (Id.). Plaintiff requested pain medication. (Id.). Dr. MacMillan noted that plaintiff had a known history of drug seeking behaviors. (Id.). Dr. MacMillan's impression was lumbar sacral strain, radicular pain and first degree burn to the left forearm. (Id.). He prescribed Toradol and Lodine. (Id.).

Plaintiff saw Dr. J. Wessel on April 17, 1998, complaining of stress. (Tr. 242). Dr. Wessel's diagnosis was generalized anxiety disorder.[15] (Id.). Dr. Wessel prescribed Valium. (Id.).

Plaintiff presented to Dr. Richard Gayle at the Kneibert Clinic on July 3, 1998 with complaints of low back pain resulting from a fall while fishing. (Tr. 222). Plaintiff reported shooting pain in both legs and into his feet. (Id.). Plaintiff was unable to walk in his toes and his heels. (Id.). He also indicated that he had been dropping things with his left hand. (Id.). Dr. Gayle's diagnosis was acute low back injury, acute low back pain, and mild spasms of the back. (Id.). He prescribed Ibuprofen, Flexeril, and Ultram.[16] (Id.). On July 7, 1998, a CT scan revealed post-operative changes at L5-S1, with no fracture or bony change. (Tr. 225). On July 22, 1998, plaintiff complained of low back pain, leg pain, arm pain, neck pain, and all-over joint pain. (Tr. 223). Upon physical examination, Dr. Gayle found tenderness and spasm in the cervical and lumbar back. (Id.). Dr. Gayle's diagnosis was multiple joint pain, possible

---

[15]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. See Stedman's at 526.

[16]Ultram is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2393.

rheumatoid arthritis,[17] and neck pain.  (Id.).

Plaintiff saw Kenneth G. Mayfield, a Licensed Psychologist, for a psychological evaluation, on July 29, 1998.  (Tr. 243-46).  Plaintiff's complaints were listed as back and knee injury and "nerves."  (Tr. 243).  Plaintiff reported feeling anxious and depressed and attributed this partially to an on-going custody battle with his ex-wife.  (Tr. 243-44).  Dr. Mayfield noted that plaintiff underwent substance abuse treatment when he was in his early twenties after receiving probation for drug possession charges.  (Tr. 244).  Plaintiff claimed that he has been sober since.  (Id.).  Dr. Mayfield summarized that although there were suggestions of secondary depression, plaintiff did not appear accessible to treatment and that plaintiff's insight was fair to good, with no impairment in judgment or reasoning.  (Tr. 245).  Dr. Mayfield found that plaintiff's ability to relate to others was intact.  (Id.).  He noted that there was no evidence of marked social isolation or constriction of interests and habits, and that plaintiff was able to care for his basic personal needs.  (Id.).  Dr. Mayfield stated that plaintiff was able to understand and follow directions and appeared capable of performing simple repetitive tasks.  (Id.).  Dr. Mayfield found that plaintiff's ability to cope with stress and pressures of routine work activities was considered questionable, although plaintiff was otherwise capable of comprehending and following basic personal and financial affairs.  (Id.).  Dr. Mayfield's diagnosis was rule out mood disorder due to pain and physical limitations.  (Id.).  He assessed a GAF of 70.[18]  (Id.).

---

[17]A generalized disease, occurring more often in women, which primarily affects connective tissue.  See Stedman's at 149.

[18]A Global Assessment of Functioning (GAF) score of 70 indicates "some mild symptoms," or "some difficulty in social, occupational, or school functioning, but the individual is "generally functioning pretty well."  Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. 1994) ("DSM IV").

On July 30, 1998, Dr. Gayle diagnosed plaintiff with multiple joint pains, inflammatory joint disease, possible herniated lumbar disc, and gouty arthritis. (Tr. 224). On August 12, 1998, plaintiff presented with complaints of severe pain in his low back and pain and numbness in his left arm. (Id.). Dr. Gayle indicated that plaintiff had undergone a CAT scan, which revealed a mild bulge of the disc at L4, L5. (Id.). Dr. Gayle's diagnosis was back pain and suspected lumbar herniated disc. (Id.). Dr. Gayle prescribed Darvocet.[19] (Id.).

On August 12, 1998, Peter S. Moran, D.O, completed a Mental Residual Functional Capacity Assessment. (Tr. 257-59). Dr. Moran expressed the opinion that plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods; and ability to set realistic goals or make plans independently of others. (Tr. 257-58). Dr. Moran found that plaintiff was not significantly limited in any other areas. (Id.). Dr. Moran noted that these limitations were based upon plaintiff's depression and history of substance abuse. (Tr. 259). He stated that plaintiff's depression was likely due to his pain and physical problems. (Id.). Dr. Moran found that plaintiff was capable of performing simple, repetitive tasks and that it would be best for plaintiff to perform in a low-stress environment. (Id.). Dr. James Spence indicated that he had reviewed plaintiff's records and affirmed the assessment of Dr. Moran. (Tr. 259).

Plaintiff presented to Richard M. Secor, D.O. for a consultative examination on August 13, 1998. (Tr. 251-53). Upon physical examination, Dr. Secor found that plaintiff's gait was unremarkable, and that he was able to stand on his heels but not on his toes. (Tr. 253). Plaintiff

---

[19]Darvocet is indicated for the relief of mild to moderate pain. See PDR 54th Ed. at 1574.

had no gross muscle asymmetry or atrophy involving the lower extremity or musculature. (Id.).

Plaintiff was able to sit and stand without assistance but he was unable to lie down. (Id.). He had

muscle spasm from T12 to L5 and S1 on the left, with spasm of the trapezius muscle and painful

rotation and side bending. (Id.). Dr. Secor's impression was: (1) chronic low back pain, status

post fusion L5, S1 with possible post surgical arthritis or scarring; (2) possible multi-level disc

involvement; and (3) possible muscle spasm of the shoulder girdle on the left with possible nerve

root impingement at C7, 8, T1 interspace. (Id.). Dr. Secor recommended that plaintiff undergo

an MRI and possible myelogram of the post surgical area of the lumbar spine, as well as

concomitant neurosurgical evaluation of the cervical area. (Id.). He also recommended a trial of

non-steroidals and a physical therapy and exercise program. (Id.).

Dr. Kirk Bowman, Jr., completed a Residual Physical Functional Capacity Assessment on

September 2, 1998. (Tr. 270-77). Dr. Bowman expressed the opinion that plaintiff was capable

of lifting twenty pounds occasionally and ten pounds frequently, standing or walking six hours in

an eight-hour workday, sitting six hours in an eight-hour workday, and pushing or pulling an

unlimited amount. (Tr. 271). Dr. Bowman found that plaintiff could occasionally stoop and

crouch and could never climb ladders, ropes, or scaffolds. (Tr. 272). Dr. Bowman further found

that plaintiff was limited in his ability to reach and feel with respect to his left arm only.

(Tr. 273). He found that plaintiff had no visual, communicative, or environmental limitations.

(Tr. 273-74). Charles P. McGinty, M.D. indicated that he had reviewed the medical evidence and

affirmed the assessment of Dr. Bowman. (Tr. 277).

Plaintiff presented to Dr. Gayle on September 10, 1998, with complaints of low back pain,

left leg pain with burning, neck pain, and left arm pain. (Tr. 279). Upon physical examination,

plaintiff demonstrated that he could walk on his heels and toes, stand on either leg and bend at the knee. (Id.). Dr. Gayle found no weakness in the upper extremities or shoulder girdle. (Id.). Plaintiff exhibited no sensory deficit in his upper or lower extremities. (Id.). Plaintiff's neck exam revealed no spasm. (Id.). Dr. Gayle stated that plaintiff's CAT scan did not suggest any kind of nerve root compression. (Id.). Dr. Gayle indicated that he gave plaintiff an excuse to not do any lifting or bending for two weeks. (Tr. 280).

Plaintiff saw Dr. Wessel on October 27, 1998. (Tr. 286). Plaintiff complained of stress, poor grades, anxiety, hypertension, back pain and trouble sleeping. (Id.). Dr. Wessel diagnosed plaintiff with generalized anxiety disorder and prescribed Valium. (Id.). Plaintiff presented to Dr. Wessel on March 10, 1999, with complaints of "bad dreams." (Tr. 287).

Plaintiff presented to Dr. John H. True on May 12, 1999. (Tr. 438). Plaintiff reported pan in his left hand due to a fall he sustained the previous day. (Id.). It was noted that plaintiff was taking Vicodin[20] that was prescribed by Lucy Lee Hospital. (Id.). Plaintiff had swelling and tenderness over the fifth metacarpal phalangeal joint of his left hand, with no asymmetry, deformity or malalignment noted. (Id.). X-rays revealed a fractured fifth metacarpal of the neck, impacted, with slightly angulation, but very minimal. (Tr. 439). Dr. True's assessment was fractured left hand; fifth metacarpal neck, impacted stable, slightly angulated. (Id.).

Plaintiff saw Dr. Wessel on August 13, 1999. (Tr. 305). Dr. Wessel stated that he noticed some improvement. (Id.). Plaintiff reported poor sleep, decreased appetite, adhedonia,

---

[20]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 535.

and decreased sexual interest. (Id.). Dr. Wessel's diagnosis was major depressive disorder,[21] and anxiety not otherwise specified. (Id.). He increased plaintiff's dosages of Celexa[22] and Xanax.[23] (Id.).

Plaintiff saw Dr. Gayle on August 23, 1999, with complaints of increasing headaches. (Tr. 526). Dr. Gayle diagnosed plaintiff with migraine syndrome and prescribed Elavil.[24] (Id.). On September 11, 1999, plaintiff complained of back pain. (Id.). Upon physical examination, Dr. Gayle found myospasm[25] along the medial side of the left scapula. (Id.). Dr. Gayle's assessment was back pain, myositis,[26] and myospasm. (Id.). He prescribed Skelaxin.[27] (Id.). On October 5, 1999, plaintiff complained of pain in the right shoulder and elbow after falling from a moving vehicle. (Tr. 527). X-rays of the shoulder and elbow revealed no evidence of fracture or dislocation. (Id.). Dr. Gayle prescribed Ultram. (Id.).

Plaintiff saw Steve Larson, Ph.D., a Licensed Clinical Psychologist, on May 24, 2000. (Tr. 499-501). Plaintiff reported difficulty getting along with his coworkers because of

---

[21]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. See Stedman's at 478.

[22]Celexa is indicated for the treatment of depression. See PDR at 1176.

[23]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. See PDR 54th Ed. at 2492.

[24]Elavil is indicated for the relief of symptoms of depression. See PDR 54th Ed. at 549.

[25]Spasmodic muscular contraction. Stedman's at 1177.

[26]Inflammation of a muscle. See Stedman's at 1176.

[27]Skelaxin is indicated for the relief of discomforts associated with acute, painful musculoskeletal conditions. See PDR at 1717.

personality conflicts. (Tr. 499). Plaintiff indicated that his grades at a community college were gradually going down due to difficulty concentrating. (Id.). Plaintiff reported that he does not have many friends and that he does not like to be around people because he does not get along with them. (Id.). Plaintiff indicted that his medications caused him to experience difficulty concentrating. (Id.). Plaintiff reported that he was not going to outpatient counseling other than seeing a psychiatrist. (Id.). Plaintiff stated that he had been experiencing problems with depression and anxiety off and on for the past five years, which had increased in the past year. (Id.). He reported difficulty falling asleep at night, fatigue, reduced appetite, weight loss, and mood swings. (Id.). After performing a mental status exam, Dr. Larson found that plaintiff was functioning in the average range of estimated intelligence, but he had noticeable impairments with his attention, concentration, and memory. (Tr. 500). Dr. Larson expressed the opinion that plaintiff could understand relatively complex verbal instructions, and that he could manage his own money. (Tr. 500-01). He found that plaintiff would have a difficult time working at a job that required sustained attention and concentration. (Tr. 501). Dr. Larson noted that plaintiff did not have the best of social skills and rarely socialized with other people. (Id.). He stated that plaintiff was capable of most self-care functions except for cleaning and doing the laundry. (Id.). Dr. Larson diagnosed plaintiff with major depressive disorder, recurrent, moderate; and not otherwise specified anxiety disorder. (Id.). He assessed a GAF of 48.[28] (Id.).

Plaintiff saw Kimberly A. Schisler, D.O. for a consultative examination on May 31, 2000. (Tr. 502-04). Dr. Schisler's impression was anxiety/depression, history of migraines, and left

_____

[28]A GAF score of 48 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV at 32.

knee pain. (Tr. 503). Dr. Schisler noted that plaintiff refused to do some of the range of motion tests and gave poor effort on others. (Id.). Dr. Schisler found that plaintiff's limitations were not physical in nature. (Id.). She expressed the opinion that plaintiff has severe problems with anxiety and depression which limit his ability to concentrate and focus while performing job-related functions. (Tr. 503-04).

In a letter dated October 20, 2000, Jorge Maldonado M.D. indicated that he had been treating plaintiff since June 15, 1999. (Tr. 498). Dr. Maldonado stated that plaintiff's diagnosis has been major depressive disorder and that plaintiff has always had symptoms of depression and anxiety, which have not improved to any significant degree. (Id.). He noted that plaintiff reported that these symptoms interfere with his schoolwork. (Id.). Dr. Maldonado stated that he had prescribed numerous medications to treat plaintiff's symptoms, including five different antidepressants, anxiolytics, and antipsychotics. (Id.).

Plaintiff presented to the Kneibert Clinic on July 11, 2001, with complaints of left hand pain and stiffness and drawing of the fingers. (Tr. 529). Nurse Terry Reese found tenderness in the left hand at the proxminal end of the thumb. (Id.). An x-ray of the left hand revealed a possible small crack at the end of the thumb. (Tr. 530). The assessment was acute pain of the left hand, drawing of the left hand and multiple joint pains. (Id.). Naprosyn was prescribed. (Id.). On July 24, 2001, plaintiff presented for re-evaluation of multiple joint pains and pain in the left hand. (Id.). Nurse Reese indicated that test results and an x-ray taken of plaintiff's hand were normal. (Id.).

Plaintiff saw Michael P. Toney, D.O. on December 10, 2002. (Tr. 446). Dr. Toney noted that plaintiff had muscle tightness and tenderness in the mid thoracic region and decreased range

of motion of the neck due to paravertebral muscle tightness in the cervical region. (Id.). Dr. Toney's impression was muscle strain/sprain secondary to whiplash injury in the neck, suspected strain/sprain of the mid thoracic muscles; and contusion possibly secondary to seat-belt in the left lower rib region. (Id.). He prescribed Soma[29] and Tylenol III.[30] (Id.). Plaintiff presented for a follow-up on December 16, 2002. (Tr. 448). Plaintiff reported some minor improvement with paravertebral muscle tightness. (Id.). Dr. Toney's impression was cervical and thoracic paravertebral muscle strain secondary to motor vehicle accident. (Id.). Dr. Toney continued plaintiff on Flexeril, ibuprofen, and Tylenol III. (Id.). On December 23, 2002, Dr. Toney indicated that plaintiff had somewhat improved. (Tr. 449). Dr. Toney's impression was suspect cervical and thoracic paravertebral muscle strain secondary to motor vehicle accident; possibility of disc disease but suspect less likely at this point; and suspect some nerve impingement causing some problems in the fourth and fifth digits left hand. (Id.). He continued plaintiff on his medication regimen. (Id.). On December 28, 2002, plaintiff reported that he had been working and that he could get through the workday. (Tr. 450). Dr. Toney's impression was suspect slow improvement. (Id.). He continued plaintiff's medications and recommended that plaintiff continue working. (Id.). On January 6, 2003, plaintiff reported some improvement in the neck but continued problems with numbness in the fingers of his left hand. (Tr. 451). Dr. Toney's impression was apparently persistent discomfort secondary to motor vehicle accident; muscle spasm with nerve impingement; and may consider possibility of disc disease. (Id.). Plaintiff

---

[29]Soma is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions. See PDR 54th Ed. at 3160.

[30]Tylenol III, or Tylenol with Codeine, is indicated for the relief of mild to moderately severe pain. See PDR at 2392.

presented on January 27, 2003 with complaints of left hand pain after sustaining a fall at work. (Tr. 458). Plaintiff had full range of motion of all extremities and no swelling. (Id.). X-rays revealed no evidence of acute fracture. (Id.). Dr. Toney's impression was contusion to the left hand. (Id.). On February 3, 2003, plaintiff continued to complain of pain in his left hand. (Tr. 457). Dr. Toney's impression was persistent left hand pain, suspect possibility of cartilage or tendon damage; and still doubt fracture, although hairline fracture is possible. (Id.). On March 18, 2003, plaintiff complained of anxiety due to problems with his ex-wife. (Tr. 552). Dr. Toney noted that plaintiff had been taking Paxil[31] prescribed by Dr. Gayle. (Id.). Plaintiff denied experiencing even minimal depression. (Tr. 553). Dr. Toney's impression was anxiety and history of neck pain. (Id.). He recommended that plaintiff restart Paxil. (Id.).

On March 27, 2003, plaintiff reported gastrointestinal upset due to medication. (Tr. 555). Dr. Toney's impression was neck pain, slowly improving. (Id.). Dr. Toney noted that he informed plaintiff that he should get pain medication from only one physician. (Id.).

In a statement to Aetna Insurance Company, Dr. Kevin Roberts, a chiropractor, indicated that he had last treated plaintiff for neck pain and headache in March of 2003. (Tr. 465). Plaintiff had muscle spasms and neck pain. (Id.). X-rays revealed spinal stenosis[32] at C3-C4. (Id.). Dr. Roberts imposed the limitations of no lifting or bending for extended periods. (Tr. 466). Dr. Roberts expressed the opinion that plaintiff was incapable of performing even sedentary activity at that time. (Id.).

Plaintiff presented to Richard Moore, M.D., at Southeast Missouri Hospital Pain Clinic on

---

[31]Paxil is indicated for the treatment of depression and anxiety. See PDR at 1530-31.

[32]Narrowing of the spinal canal. See Stedman's at 1694.

March 25, 2003, upon the referral of Dr. Roberts. (Tr. 470). Plaintiff complained of severe neck pain and aching in the left arm. (Id.). Dr. Moore's impression was left cervical radiculopathy. (Id.). Dr. Moore administered an epidural steroid injection, scheduled a CAT Scan, and prescribed Vioxx,[33] Lortab, and Norflex.[34] (Id.).

Plaintiff presented to Madison Medical Center on March 28, 2003, at which time he was diagnosed with foraminal stenosis at C3-C4. (Tr. 492). Plaintiff underwent x-rays of the cervical spine, which revealed moderate right and mild left neural foraminal[35] stenosis at C3, mild bilateral neural foraminal stenosis at C4, and no evidence of herniated disc, fracture or dislocation. (Tr. 493).

Plaintiff saw Dr. Toney on April 17, 2003, for complaints of headache, neck pain, and numbness in the fourth and fifth digits of the left hand. (Tr. 556). Dr. Toney's impression was history of neck pain and chronic muscle spasm in the mid to upper thoracic region. (Tr. 557). Dr. Toney prescribed Ultracet.[36] (Id.). On April 22, 2003, plaintiff complained of pain in his mid-back. (Tr. 558). Dr. Toney's impression was problems with neck and back have worsened since December 9, 2002 motor vehicle accident and these problems have contributed to patient's inability to work at this time. (Id.). Dr. Toney prescribed Prednisone, Flexeril, and Valium. (Id.). On May 5, 2003, Dr. Toney indicated that plaintiff had seen a neurosurgeon, Dr. Kee Park, and

[33]Vioxx is indicated for the relief of osteoarthritis and for the management of acute pain. See PDR 54th Ed. at 1913.

[34]Norflex is indicated for the relief of discomfort associated with acute painful musculoskeletal conditions. See PDR at 1856.

[35]An aperture or perforation through a bone. Stedman's at 698.

[36]Ultracet is indicated for the short-term management of acute pain. See PDR at 2373.

that Prednisone and Flexeril had not helped.  (Tr. 559).

Plaintiff presented to Dr. Park on May 19, 2003, with complaints of severe neck pain and left arm pain with numbness and tingling involving the fourth and fifth finger.  (Tr. 482).  A neurological examination revealed that plaintiff had full muscle strength in all extremities, normal gait, normal tone, and no atrophy.  (Id.).  A CAT scan of the cervical spine was normal. (Tr. 483).  Dr. Park's assessment was neck and left arm pain suggestive of cervical radiculopathy. (Id.).  Dr. Park declined to write plaintiff any medications unless an MRI confirmed a problem. (Id.).

Plaintiff presented to Dr. Toney on May 20, 2003, with complaints of back and neck pain, headache, and left hand pain.  (Tr. 561).  Plaintiff requested a refill of pain medication and admitted that he had been taking more that the prescribed dose at times.  (Id.).  Dr. Toney's impression was neck and posterior shoulder pain, etiology unknown; left hand pain; and headaches.  (Id.).  He refilled the Percocet.  (Id.).  Plaintiff requested medication refills on June 3, 2003 and on June 20, 2003, which Dr. Toney denied.  (Tr. 562-63).  Dr. Toney informed plaintiff that he would not be refilling his medications unless it lasted longer.  (Tr. 563).

On June 26, 2003, Dr. Park stated that an MRI revealed some bulging discs but no definitive nerve root compression. (Tr. 484).  Dr. Park recommended that plaintiff undergo a cervical myelogram to rule out nerve root compression.  (Id.).

On July 3, 2003, Dr. Park reported that a cervical myelogram showed no definite spinal cord compression and some anterior thecal defects at C4-5 and C6-7.  (Tr. 485).  Dr. Park stated that post-myelogram CT scan revealed C3-4 foraminal encroachment bilaterally and bulging discs centrally at C4-5, C5-6, and C6-7 without significant spinal cord compression or foraminal

encroachment. (Id.). Dr. Park's impression was C3-4, C4-5 foraminal encroachment bilaterally due to degenerative changes and no definite spinal cord compression at the other levels. (Id.). On July 10, 2003, Dr. Park stated that plaintiff's cervical myelogram showed some spondylosis[37] at the C3-4 area and some bulging discs at C4-5, C5-6 and C6-7, with no definite spinal cord compression or nerve root compression. (Tr. 487). Dr. Park recommended cervical steroid injections but did not recommend surgery. (Id.).

In a statement dated July 22, 2003, Lynda Lorenz, R.N. indicated that plaintiff required assistance with some grooming, meal preparation, transportation, and some housekeeping chores. (Tr. 605).

On September 5, 2003, plaintiff presented to Dr. Toney requesting pain medication. (Tr. 567). Plaintiff complained of left neck pain. (Id.). Dr. Toney's impression was chronic recurrent pain. (Id.). Dr. Toney instructed plaintiff to follow-up with one physician only for pain medications and informed plaintiff that he would no longer be filling his pain medication. (Id.). He recommended that plaintiff see Dr. Park at the pain clinic. (Id.).

Plaintiff presented to Paul Rains, D.O. on September 9, 2003, with complaints of neck pain, back pain, left knee pain, and right foot pain. (Tr. 570). His assessment was multiple musculoskeletal pain secondary to fractures and herniated discs; chronic cervical back pain; chronic lumbar back pain; possible mild hearing loss; and chronic anxiety. (Id.). Dr. Rains indicated that although plaintiff requested narcotics, he informed plaintiff that narcotics were not appropriate. (Id.). Dr. Rains prescribed a cane and referred plaintiff to a pain management

---

[37]A term applied nonspecifically to any lesion of the spine of a degenerative nature. See Stedman's at 1678.

physician.  (Id.).

Plaintiff presented to Reno R. Cova, M.D. for pain management on September 27, 2003.

(Tr. 572).  Dr. Cova's assessment was chronic pain syndrome associated with multiple injuries to

the left knee and right foot, lumbar spasm secondary to fusion and chronic muscle spasm in the

lumbar region, low back pain possibly associated with some nerve root encroachment and chronic

pain syndrome; lumbar, cervical muscle spasm associated with recent flexion extension injury, and

possible cervical disc degeneration.  (Id.).  Plaintiff was given Duragesic patches[38] and Percocet

for break through pain.  (Id.).  Dr. Cova also prescribed Valium for spasm in the cervical region.

(Id.).  Plaintiff presented for a follow-up of chronic low back pain on October 21, 2003.  (Tr.

594).  Plaintiff's leg strength was good and the physical exam was otherwise unremarkable.  (Id.).

Dr. Cova noted that plaintiff's pain was well-controlled with his medication, and that plaintiff was

able to perform daily activities.  (Id.).  On November 18, 2003, Dr. Cova's diagnosis was failed

back syndrome.  (Tr. 595).  Dr. Cova noted that plaintiff's urinalysis from his last visit was

negative for opioids but positive for Benzodiazepines, which was inconsistent.  (Id.).  Dr. Cova

ordered a repeat drug screen.  (Id.).  He prescribed a Duragesic Skin Patch, Percocet, and

Valium.  (Id.).

Plaintiff presented to Dr. Rains on January 5, 2004, with complaints of back pain.

(Tr. 577).  Plaintiff indicated that he had been helped a great deal by Dr. Cova.  (Id.).  Plaintiff

requested medication refills, as he could not make the trip to see Dr. Cova.  (Id.).  The assessment

of Dr. Rains was history of herniated disc L5-S1, chronic cervical pain, and chronic anxiety.  (Id.).

---

[38]Duragesic is indicated for the management of persistent moderate to severe chronic pain
that requires continuous, around-the-clock opioid administration for an extended period of time
and cannot be managed by other means.  See PDR at 2374.

Dr. Rains started plaintiff on Duragesic patch, refilled his Valium prescription, and ordered x-rays. (Id.).

Plaintiff underwent a CT scan of the lumbar spine on January 10, 2004. (Tr. 579). The impression of the reviewing physician was postoperative changes at the L5-S1 level; scarring involving the L5-S1 level, associated bulging or herniated disc cannot be ruled out; degenerative arthritis involving the articulating facets at the L4-5 and L5-S1 levels; probable grade I spondylolisthesis[39] of L5 on S1; and suggest MRI of the lumbar spine with and without IV contrast for further evaluation. (Id.). CT scans taken of the cervical and thoracic spine revealed no definite significant bulging or herniated discs and mild degenerative arthritis. (Tr. 580).

On January 16, 2004, plaintiff presented to the Reynolds County Memorial Hospital Emergency Room with complaints of lower back pain and headaches. (Tr. 588). Plaintiff was diagnosed with chronic back pain and migraine headache. (Id.).

On May 26, 2004, Dr. Cova stated that plaintiff continued to have severe back pain that interfered with his ability to function at home and at work. (Tr. 600). Upon physical examination, plaintiff exhibited good strength in most all muscle groups and intense low back spasm. (Id.). Dr. Cova noted that injections in the paravertebral muscle had given plaintiff moderate relief. (Id.). Dr. Cova expressed the opinion that plaintiff was disabled from physical work at that time, although he may be able to perform sedentary work if he had the ability to change positions and to be relieved of his work during periods of intense pain. (Tr. 601). Dr. Cova noted that plaintiff experienced severe pain with extension and limited flexion, he was

_____

[39]Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. Stedman's at 1678.

unable to sustain any continuous bending, and his lumbar paravertebral muscles were very spastic and tender.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 2003.

2.    The claimant may have engaged in substantial gainful activity beginning in June 2002, but the decision in this case is not made at this step as the claimant did not engage in substantial gainful activity during the entire period of alleged disability.

3.    The claimant's history of a partial laminectomy with lateral fusion at L5/S1 in 1980, generalized anxiety disorder, mood disorder, and degenerative changes of the cervical spine, are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).  The claimant also has a history of drug and alcohol abuse.

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant retains the residual functional capacity to perform the exertional and nonexertional requirements of work with the following limitations.  The claimant can lift 20 pounds occasionally and 10 frequently.  The claimant can stand and/or walk six hours in an 8-hour workday with normal breaks and sit six hours in a workday with normal breaks.  The claimant can occasionally stoop and crouch.  The claimant can never climb ladders, scaffolds or ropes, and due to mental impairments is limited to simple and or repetitive work.

7.    The claimant's limitations due [sic] not prevent him from performing his past relevant work as machine operator.  20 CFR §§ 404.1565 and 416.965.

8.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.  20 CFR §§ 404.1520(f) and 416.920(f).

(Tr. 325).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based upon the applications filed on June 22, 1998, the claimant is not entitled to a period of disability, Disability Insurance Benefits, and not eligible for Supplemental Security Income payments under Sections 216(I), 223, 1602, and 1614(a)(30(A) respectively, of the Social Security Act.

(Tr. 326).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff raises three claims on appeal of the decision of the Commissioner. Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next

argues that the ALJ erred in discrediting his subjective complaints of pain and limitations. Plaintiff finally argues that the ALJ improperly relied on vocational expert testimony. The undersigned will consider plaintiff's claims in turn, beginning with his second claim.

1.      **Credibility Analysis**

Plaintiff argues that the ALJ erroneously found his subjective complaints of pain and limitation not credible. Defendant argues that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

In his opinion, the ALJ pointed out Polaski factors and other inconsistencies in the record

as a whole that detract from plaintiff's complaints of disabling pain. (Tr. 314-24). The ALJ first provided a detailed summary of the objective medical record. The ALJ stated that although plaintiff alleges disability due to a number of impairments, his complaints to healthcare providers were relatively sporadic. (Tr. 322). For example, the ALJ noted that between December of 1999 and mid 2002, plaintiff sought only very infrequent medical attention from primary care physician Dr. Gayle and was not seen by any physician for physical complaints during this time. (Tr. 322). The ALJ pointed out that when seen by Dr. Schisler on May 31, 2000, plaintiff did not give much information about his history, refused to do some range of motion tests, and gave poor effort on others. (Tr. 322-23, 502-03). The ALJ may consider the claimant's willingness to submit to treatment in determining the credibility of the claimant's subjective complaints. See Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987).

The ALJ noted that plaintiff has a history of drug-seeking behavior. (Tr. 323). Plaintiff's drug-seeking behavior is well-documented in the medical record. In June 1995, Dr. MacMillan denied plaintiff's request for medication refills and instructed plaintiff that the medication must last two months. (Tr. 174). On June 15, 1995, Dr. MacMillan noted that plaintiff requested "additional mood altering substances," and that he denied plaintiff's request. (Tr. 176). He noted that plaintiff had a history of drug-seeking behavior on June 17, 1996. (Tr. 177). On March 27, 2003, Dr. Toney informed plaintiff that he should obtain pain medication from only one physician. (Tr. 555). On May 20, 2003, plaintiff admitted to Dr. Toney that he had been taking more than the prescribed dosage of medication. (Tr. 561). Dr. Toney denied plaintiff's request for medication refills on June 3, 2003, June 20, 2003, and on September 5, 2003. (Tr. 562-63, 567). On September 5, 2003, Dr. Toney informed plaintiff that he would not be

refilling his medication any longer. (Tr. 567). On September 9, 2003, Dr. Rains indicated that although plaintiff requested narcotics, he informed plaintiff that narcotics were not appropriate. (Tr. 570). On November 18, 2003, Dr. Cova noted inconsistencies between the medication plaintiff was prescribed and his urinalysis. (Tr. 595). A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations. Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003).

Further, the ALJ noted that Dr. Cova indicated on October 21, 2003 that plaintiff's pain was well-controlled to about a level four, which allowed for daily activities. (Tr. 323, 594). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

The ALJ also discussed plaintiff's daily activities. The ALJ pointed out that plaintiff worked for significant periods in 2001, 2002, and 2003, attended community college for several semesters beginning in 1998, and cared for his children. (Tr. 321, 614, 515-19, 646). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). Further, the fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

The ALJ pointed out that plaintiff applied for and received unemployment benefits during the period he alleges he was disabled. (Tr. 323). The application for unemployment benefits requires an assertion of the ability to work and is facially inconsistent with a claim of disability.

Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient.

Accordingly, the undersigned does not recommend reversal or remand on this ground.

## 2.      Residual Functional Capacity

Plaintiff argues that the ALJ erred in assessing his residual functional capacity. Specifically, plaintiff contends that the ALJ erred in relying on the opinion of the state agency consulting physician and rejecting the opinion of treating physician Dr. Cova.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See <u>Lauer</u>**,** 245 F.3d at 703.

After discussing the objective medical evidence and plaintiff's own statements regarding his impairments, the ALJ concluded:

> [t]he undersigned finds the claimant retains the following residual functional capacity: The claimant retains the residual functional capacity to perform the exertional and nonexertional requirements of work with the following limitations. The claimant can lift 20 pounds occasionally and 10 frequently. The claimant can stand and/or walk six hours in an 8-hour workday with normal breaks and sit six hours in a workday with normal breaks. The claimant can occasionally stoop and crouch. The claimant can never climb ladders, scaffolds or ropes, and due to mental impairments is limited to simple and or repetitive work.

> This finding of residual functional capacity is essentially consistent with that found by State disability determination service consultative physicians. The claimant performed light level work during a portion of the period he alleges that he was disabled. With the exception of Dr. Cova's recent analysis, which the undersigned does not find to be credible in terms of long term limitations, no treating or examining physician has placed greater specific long term physical limitations on the claimant.

(Tr. 324).

In the instant case, the undersigned finds that the ALJ's assessment of residual functional capacity is not supported by substantial evidence. The ALJ found that plaintiff was capable of performing a limited range of light work. As support for his residual functional capacity determination, the ALJ stated that the determination was "essentially consistent" with the opinion of the state agency consulting physicians. (<u>Id.</u>). It has been held to be error for an ALJ to give more weight to non-medical evidence than to medical evidence. See <u>Jeffcoat v. Bowen</u>, 840 F.2d 592, 596 (8th Cir. 1988). In making a finding of residual functional capacity, however, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See <u>Lauer</u>**,** 245 F.3d at 704 (emphasis added).

- 40 -

Here, the ALJ indicated that his residual functional capacity assessment was "essentially consistent with that found by State disability determination service consultative physicians." (Tr. 324). The ALJ is presumably referring to the Residual Physical Functional Capacity Assessment completed by Dr. Kirk Bowman, Jr., along with Dr. Charles P. McGinty, on September 2, 1998. (Tr. 270-77). The assessment of Drs. Bowman and McGinty is the only medical evidence to which the ALJ cites in support of his determination. The opinion of a consulting physician who does not examine the claimant does not generally constitute substantial evidence. See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Kelley, 133 F.3d at 589. Drs. Bowman and McGinty expressed the opinion that plaintiff was capable of lifting twenty pounds occasionally and ten pounds frequently, standing or walking six hours in an eight-hour workday, sitting six hours in an eight-hour workday, and pushing or pulling an unlimited amount. (Tr. 271). Drs. Bowman and McGinty found that plaintiff could occasionally stoop and crouch and could never climb ladders, ropes, or scaffolds. (Tr. 272). Drs. Bowman and McGinty further found that plaintiff was limited in his ability to reach and feel with respect to his dominant left arm. (Tr. 273). The ALJ did not include plaintiff's limitation in his ability to reach and feel in his dominant left arm in his residual functional capacity assessment. As such, the ALJ's determination is not completely supported by the opinion of the state agency consulting physicians.

The ALJ acknowledged that his determination was inconsistent with the most recent opinion of treating physician Dr. Cova. In a letter dated May 26, 2004, Dr. Cova stated that he considered plaintiff "disabled from physical work at this time." (Tr. 601). Dr. Cova also expressed the opinion that plaintiff may be able to perform some type of sedentary employment if he had the ability to change positions and to be relieved of his work during periods of intense pain.

(Id.). Dr. Cova noted that plaintiff experiences severe pain with extension and limited flexion and that he is unable to sustain any continuous bending. (Id.). He further noted that plaintiff's lumbar paravertebral muscles were very spastic and tender. (Id.). The ALJ found that Dr. Cova's letter was not credible in terms of defining plaintiff's limitations for a period of twelve months or longer. (Tr. 320, 324).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108,1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148.

Dr. Cova's opinion regarding plaintiff's ability to function in the workplace was supported by Dr. Cova's own treatment notes and the objective medical record. Dr. Cova, a pain management specialist, first saw plaintiff on September 27, 2003, at which time he found that plaintiff had severe neck spasm with limited range of motion and some weakness in grip on the left hand. (Tr. 572). Dr. Cova also noted that plaintiff was stiff within the lumbar region, extension caused him pain, and plaintiff had pain over the SI joints. (Id.). Dr. Cova prescribed Duragesic patches, Percocet, and Valium. (Id.). On November 18, 2003, Dr. Cova diagnosed plaintiff with failed back syndrome. (Tr. 595). Neurologist Dr. Park found based upon objective testing that plaintiff had foraminal encroachment bilaterally due to degenerative changes. (Tr. 485). Dr. Rains found that plaintiff had degenerative arthritis at L4-L5, L5-S1, with spondylolisthesis of L5 on S1.

(Tr. 579). Thus, Dr. Cova's opinion is supported by the medical record.

The ALJ stated that no treating or examining physician has placed greater specific long term physical limitations on plaintiff. Contrary to the ALJ's assertion, the medical record reveals that both treating and examining physicians have consistently imposed greater limitations on plaintiff. In March of 2003, chiropractor Dr. Kevin Roberts stated that he had treated plaintiff for neck pain, muscle spasms, and headaches. (Tr. 465). Dr. Roberts expressed the opinion that plaintiff was incapable of performing even sedentary activity. (Id.). On April 22, 2003, treating physician Dr. Toney stated that plaintiff's problems with his neck and back have worsened since his December 2002 motor vehicle accident and these problems have contributed to plaintiff's inability to work at that time. (Tr. 558). Dr. Toney prescribed Prednisone, Flexeril, and Valium. (Id.). On July 22, 2003, nurse Lynda Lorenz indicated that due to his chronic neck and back pain, plaintiff required assistance with grooming, meal preparation, transportation, and housekeeping. (Tr. 605). In sum, every medical professional who expressed an opinion regarding plaintiff's physical limitations imposed greater restrictions than those found by the ALJ.

The medical record also is supportive of greater mental limitations than those found by the ALJ. Consultative psychologist Dr. Larson found that plaintiff had noticeable impairments with his attention, concentration, and memory. (Tr. 500). Dr. Larson found that plaintiff would have a difficult time working at a job that required sustained attention and concentration. (Tr. 501). He also noted that plaintiff did not have the best social skills. (Id.). Dr. Larson assessed a GAF of 48, which indicates a serious impairment in occupational functioning. (Id.). Consultative physician Dr. Schisler found that plaintiff had severe problems with anxiety and depression, which limit his ability to concentrate and focus while performing job-related functions. (Tr. 503-04). In a letter

dated October 20, 2000, Dr. Jorge Maldonado indicated that he had been treating plaintiff since June of 1999, and that plaintiff had always had symptoms of depression and anxiety that have not improved to any significant degree. (Tr. 498). Dr. Maldonado stated that plaintiff's symptoms interfere with his schoolwork. (Id.). He indicated that he had prescribed numerous medications to treat plaintiff's symptoms, including five different antidepressants, anxiolytics, and antipsychotics. (Id.).

For all the foregoing reasons, the undersigned finds that the ALJ improperly discounted the medical opinions of treating physicians and formulated a residual functional capacity not based on the medical evidence in the record. The medical record as a whole is supportive of much greater limitations than those found by the ALJ. Accordingly, the undersigned recommends that this matter be reversed and remanded back to the Commissioner in order for the ALJ to accord the proper weight to the medical statements of the medical practitioners, and to formulate plaintiff's residual functional based upon the medical evidence contained in the record.

### 3. Vocational Expert Testimony

Plaintiff argues that the ALJ erred by improperly relying on vocational expert testimony. Specifically, plaintiff argues that the hypothetical question posed to the vocational expert does not accurately portray plaintiff's limitations.

Throughout the disability determination process, the burden remains on the claimant until she adequately demonstrates an inability to perform her previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work as it exists in the national economy. See Beckley, 152 F.3d at 1059; 20 C.F.R. §§ 404.1520(f), 416.920(f). "Under the five-step analysis of social security cases, when a claimant can perform his past relevant

work, he is not disabled. Once this decision is made ... the services of a vocational expert are not necessary." Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (quoting Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996)).

Here, the ALJ compared plaintiff's residual functional capacity to plaintiff's past work and found that plaintiff could return to his past work as an unskilled machine operator. (Tr. 324). The ALJ used vocational expert testimony to assist him in making this determination. The ALJ further found that plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). "A hypothetical question posed to [a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). It must "capture the concrete consequences of the claimant's deficiencies." Id. (citing Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997)).

The undersigned has found that the residual functional capacity formulated by the ALJ is not supported by substantial evidence. The hypothetical questions posed to the vocational expert were based upon this erroneous residual functional capacity. To this extent, the vocational expert's opinion regarding plaintiff's ability to perform other jobs in the national economy is not supported by substantial evidence. Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to pose a hypothetical question to the vocational expert based on a new residual functional capacity.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have eleven (11) days, until February 12, 2007, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  31st  day of January, 2007.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE